Could we hear next from the parties in Berg v. New York City Police Commissioner? May please the court. Kathy Park for the appellants. Ms. Park, I don't know what you want. I think the podium comes down a little bit if it's easier for you. Thank you, Your Honor. What isn't disputed in this case is that the protection of the President is of utmost importance. And that's what defendants were charged with doing during one of President Obama's nighttime visits to Midtown Manhattan. This court should reverse the district court's decision requiring defendants to go to trial for the on-the-spot decisions that they took that night for the President's safety. The police permitted the protesters to fully engage in their expressive activities at a location that they chose. And all that the police required was that for the protesters to stay in that location until the President left. The crux of the district court's decision was that fact issues regarding the defendant's subjective motivations precluded summary judgment on plaintiff's constitutional claims. Aren't there also factual questions about why the hour-and-a-half detention was necessary as a matter of security for the President? And why it was necessary not to allow any of the protesters to leave during that time? That seemed contrary to what the standard practice was in the patrol guide. The record at this point doesn't have anything about specific threats. And it seems very unclear what police objective was served by declining to let persons leave the pen. Could you speak to that, please? Sure. My understanding is that there are factual issues as to the defendant's state of mind regarding why they took the actions they took and whether they believe that- No, but I mean even as an objective matter, why as a police process matter, one would have closed the pen. It didn't seem to have been standard practice. And I'm concerned about whether we can evaluate as an objective matter. We can evaluate it as an objective matter when you're considering the particular context of this case, which is the protection of the President, which is far different from most other normal police duties. You can't stand and argue to us, no matter what the police did, because their objective was to protect the President, they can't be charged with a civil rights violation. So I think what we're urging you to focus on is how is this conduct, that's the basis for the plaintiff's suit, how can you say that a reasonable officer could have thought that this was permissible? Well, there's two fold. First, we consider what the police had to do, the need to improvise. At this point, the protesters had unexpectedly settled into a press pen located closer to the hotel than the originally designated protest area. So you'd given, or they'd been given a designated protest area. That's right. They moved from that and moved themselves into a press area. That's right. They had interfered, and in doing so- It was closer to where the President was located. It was directly within the line of sight of the entrance of the hotel where the President was entering. And in doing so, they interfered with the advanced security plan that the NYP had set in preparing for the security of the President. Now we get to the, they're in the pen- Yes. But they're not allowed to leave it, and you have to explain to us why a reasonable officer would not have thought that was impermissible. Well, as this court recognized in the Markavich decision, security planning necessarily requires officers, or a reasonable officer, to consider the worst case scenario. Here, the police not only had to consider the risk that the protesters might have posed themselves, or the fact that a protest might have turned violent at any point, but also the fact that there were a number of security concerns posed by, even if the protesters themselves weren't dangerous, that may have inadvertently interfered or hampered with the officer's ability to make the location safe. And that's the fact that you have a large group of protesters clustered together, making it much more difficult for officers to detect suspicious activity. What if the President had decided to extend his stay, and had stayed for four hours, or overnight? Would it have been reasonable for the officers to believe that they could detain the protesters there, without bathroom facilities, overnight, or for four hours? Well, because the special needs doctrine, which is the doctrine that we're relying on here, is a balancing test. In that circumstance, it would be a much closer question, but that's not what happens in this case. In this case- You still have an inadequate, or a very sketchy, description of why, from an objective policing point of view, the pen needed to be closed, and no individuals would be allowed to leave except by ambulance. Well, you have to also consider the fact that the protesters were holding signs, playing drums, obscuring the view and hearing of the police officers. And if the police were to allow one, or two, or however number of protesters to leave that designated area, it would have required the police to divert their resources. And there was no telling whether all of the protesters might have wanted to do that at once. I thought the concern that you had, if I understood the papers, was that you didn't know where they would go after leaving the pen. That's true. And it could have been across the street, where no one was being allowed to go. That's very well the case, or very well a possibility that- That's right. That's right, Your Honor. And that was a very important security concern that the police, a reasonable officer, would have been entitled to consider in discharging their duty. Where in the record is the strongest explanation for why it was objectively reasonable as a policing matter to detain all the individuals and not let any leave? I pointed to Inspector Lola's statement, who was the NYPD sector commander for the area, in response to the question, is there any reason you know people in the demonstration areas would not have been allowed to leave while the president was at the Sheridan? Not that I'm aware of. We can all imagine these things, and obviously presidential security is of utmost importance. But I'm struck in the record by the absence of a coherent account. But perhaps I've overlooked something, so I hope you will point me to the explanation. The strongest piece of evidence that we have in the record is detective, two pieces of deposition testimony. You have Inspector Hart's testimony explaining that at the point when the protesters had already defied, or had already refused to settle into their designated protest area and had reached the press pen area, which was directly across the street from the hotel, he testified that while at that point there was moments, there were only moments remaining before the president was scheduled to arrive. And because of, and this is also cited in our briefs, because of a number of security concerns, they felt that it was just, at that moment, it was, they decided it was the best plan to let them settle into this contained area. And we also have Inspector Hart's testimony, or Deputy McNamara's testimony, explaining just the risk that a number of clustered, large mass of protesters clustered together, the risk that that poses and the difficulty of the police in detecting the security risk that they, or any suspicious activity when you have such a large group. But I would remind this court that in Fourth Amendment analysis and in qualified immunity analysis, what is dispositive is what a reasonable officer would have thought, not what the police officers or lieutenant or that particular defendant actually thought at the time when he was in that time. But regardless of how we come down, it's an objective standard. That's right. That's right. It's a purely objective standard. And the district court erred in finding that fact issues regarding the subjective motivations of the defendants precluded. Objective standard, that's what I'm still looking for. Because I'm struck, even though it wasn't controlling and it wasn't a regulation, I'm struck by the patrol guide saying that one should leave, that police should allow people to leave a confined area according to their best judgment. But that was ordinary practice. And so this was a departure from ordinary practice. And I guess we are to infer that that's just justified by the fact that the president's security was at issue. Is that right? That's right. Because the patrol guide doesn't address the specific context of presidential security. And as we explained in our brief, there are a number of heightened concerns that are involved when you consider the task of maintaining security for the protection of the president. And because when you consider that task, along with the fact that there was no use of force in this case, none of the protesters were handcuffed. They were not searched or questioned. They were able to express themselves freely during the entire length of time that they were in the press pen. The fact that the police had actually accommodated their desire to be closer to the president. And if you look at- Were they advised before entering the pen? I saw a different testimony about whether they understood that they would not be able to leave the pen when entering. What's your position about that? At a minimum, the video evidence shows that at least some of the protesters had asked the police officers whether they would be allowed to leave or go on bathroom breaks or how long they would have to stay in the pen. And the video evidence clearly shows, at least to some of the protesters, they were told that it was not clear how long they would have to stay in there. There would be no bathroom breaks. And those protesters still entered the pen anyway. Were there any protesters? Does the record show whether there were protesters who declined to enter the pen and left? No, Your Honor. Actually, the video evidence doesn't show any- The record shows that all of the protesters didn't stay in the press pen. There's no indication that any of the- Not in the press pen, but none of them stayed in the designated protest area. And there's no indication in the record that anyone refused to enter the press pen at that time. And the fact- Can I just also- Sure. Can I ask whether I'm correct in understanding two other facts that are either part of the record or facts that judicial notice can be taken of? This event happened on November 30, 2011, right? That's right, Your Honor. Am I right that was also the night that the Rockefeller Center Christmas tree was being lit? That's right, Your Honor. Which would have been, what, about 15 blocks south of where this occurred? That's right. And so- And there was- The New York City Police Department was alerted to a bomb threat in connection with that other activity, correct? Well, the record shows that that was in the logs of the NYPD. Yes, the NYPD as an entity was aware of that bomb threat. And then the other fact is that this happened on November 30. It was on October 11, 2011, approximately six weeks earlier, that individuals marching under the Occupy Wall Street banner had taken the Brooklyn Bridge. Is that correct? I'm not sure of the exact date of it, but my understanding is it is around that time that that is what had happened. Your Honors, I will reserve the rest of my time for my rebuttal. Good morning, Your Honors. May it please the Court. David Rankin from Beldock Law Enforcement for appellees. Phoebe Berg, Tashir Okinda, Jonathan Rivera, Dana Rosenthal, and Jonathan Jetter. The gravity of a threat alone cannot be dispositive of law enforcement means. That's from the city of Indianapolis v. Edwards. What we have here is we have the police department having frozen between 50 and 100 people for an hour and a half without a justification. They all chose to be there. They all, absolutely. They went into this pen and the pen was closed. I mean, they were not forced in any particular place. I mean, the police did certainly move them in that. Well, they had to come closer, and the place where they could be if they wanted to be closer was the pen. Correct. The police, as you note from our briefs, did choose that location for them. And it wasn't like they stormed the pen and ran there with signs and were in any way violent to get there. There was a pen earlier, as the record reflects, that there is some dispute, and I think this is important because I think this is a disputed fact. There is some dispute as to how they moved from that pen to where they were originally detained at the press pen. Why would it make a difference? The dispute is the defendant, excuse me, the city characterizes that as an act of some sort of aggression or some kind of like they have now done something that would entitle the police to police them in a more aggressive way. The record from the testimony of the plaintiffs shows that they, many of them, had no idea there was anything. Why is that even relevant? Because we have to look at this from the position of a reasonable police officer. And from the reasonable police officer's point of view, they knew that the protesters had been assigned to one area and were not heeding that and were ending up in a press pen. So whether any individual knew it or not, I don't see really why that affects our analysis. What am I missing? It's because of how that was done. If they were being placed, if they exited their designated area in a violent or exciting manner, that would be known to all the protesters. But that's really not even the linchpin of this argument. The linchpin of this argument... It's from the police, as Judge Carney said, for purposes of qualified immunity. And at a minimum, they knew that the protesters had been designated one area and whether they were just dissatisfied with it or saw there was some other opportunity to get closer, they availed themselves of it. And that, you know, that, in the context of other Occupy Wall Street activities in the preceding six months, couldn't it have raised concern in the police mind about whether they would abide by police directives? I acknowledge, Your Honor. I mean, I don't think... I mean, to say that... Anybody who lives in New York knows that when the president moves, nobody moves. I mean, that's... Anybody who's been on a New York City street when the president is in town knows that. These people, though, were in a pen. They weren't just, you know, on the sidewalk or something. And so the gravamen of the complaint is that they weren't allowed to leave. But, you know, they had as their objective, not just getting to the Port Authority or whatever, their objective had been to confront the president. Why weren't the police reasonable in acting that that wasn't going to happen, at least until the president was out of the area? They're moving them into that pen we take no issue with. It is purely they're not being allowed to leave. And here's the reason... The question was, how did you know they were going to leave to go away from the area rather than to get even closer to the president? Well, the video reflects that there were dozens and dozens of police officers there. The protesters could have been allowed to leave one at a time, two at a time, and any possible formation of individuals leaving that area and could... The number of police were there not to deal with your clients. They were there for other security reasons related to the president, and your clients presented them with an additional one. So I'm not sure you can say, well, you know, there were hundreds of police officers there. They could have escorted these people. They would have had to have left other posts and other responsibilities. So I'm not sure why you can say that the failure to do that was a violation of constitutional rights. And more to the point, I think you'd have a problem pointing us to a case that says so. And last term, the Supreme Court was quite emphatic that you're going to have to be able to point to a case that's at least sufficiently close to have alerted the police to the fact that their conduct could not be tolerated. There was a lot there. There was a lot there. Let me see how I can. I'm going to try to take it in pieces, and if I miss something, please, I'd like an opportunity to address them. First, with regard to the policing question that Your Honor raises, there was a detail that followed this group up to this location. So there were policing resources which were assigned to them specifically, and they entered into an area by the Sheraton Hotel, which also had significant policing resources for the presidential visit. So you have two full sets of policing resources. And the reason that in the record shows how they could have escorted people out individually, it's shown because they let tourists out. Traffic on 7th Avenue was- They didn't have the concern that tourists' objective was to confront the president. If Your Honor looks at the video closely, you'll- I have. I'm sure you have. I didn't mean to imply that you had. There's a zone- So the protesters are across 7th Avenue. There's a zone kind of on that corner, and then the rest of the block back to Broadway is frozen. So all they had to do, which is what they did, in my view, or how I understand the video, what they did with the press and the tourists is they basically walked them to Broadway and Times Square, right? That puts them blocks away. That's what they did with tourists, press, and how they know people are tourists or press is a different question. But they have the ability to do this, and that is shown because they did it. And they had an hour and a half to do this. I mean, it wasn't like it needed to be done in ten minutes. We don't dispute that when the president's moving- You know, if there's a presidential motorcade in front of you, of course you can freeze that area. I mean, like, there's no- That's not what we're disputing. It's purely that there was no justification, and more to the point, there's no justification in this record. Because the issue with how policing decisions gets made, and I think this is one of the kind of communication issues with the district court's decision, where there's much talk about subjective motivations. I think really what's being talked about is what is in the mind of the person making the decision. Because the entire Fourth Amendment analysis has to go facts known to decision-maker. And, of course, then, at that point, it is an objective analysis, right? The defendants have not put forward and cannot put forward anyone that says, we made this call because of this reason. They have people that say- Why do they have to do that? Well, because that's how you make it policing. That's how the whole Fourth Amendment analysis, in my view, operates. I mean, it's facts known to the officer. I mean, that's Davenpeck. That's Saucer v. Katz. I mean, all the analysis- Facts known to the officer, it seems to me, are the president's coming here. You are, and I don't mean this at all demeaningly, a group of protesters whose object is to convey a message as forcefully as you can, without being violent, or potential. I mean, there's that potential, right? To the president. And we have given you a place that is closer to where the president is going to be than you had originally had, and you immediately took up that opportunity. So what else has to be in the mind of the police officers? Well, you need- I'm not trying to- No, thank you, Mr. Rankin. Go ahead. The issue is, if they had put forward an individual, say it was Officer McNamara, that said, I closed the pen for an hour and a half because there was a group of 75 protesters that made me nervous about the president's safety, so I went and did that. I think you would have a good argument for- What if you have- What if you're Mr. McNamara is sort of a laissez-faire cop, not that they are on this great force, but- and who just says, eh, I didn't care very much, but, you know, the chief said, let's keep these people together, and I decided that's what I was going to do. These would all be cases that would cause us a lot more problems than the one before your honors, because the city does not have a person that can say why they did what they did. The record is devoid of the person that made the call to close those pens. Therefore, the record is devoid of- You're faulting them for failing to put forward a subjective reason. I mean, the standard is, objectively, would any reasonable officer have failed to understand that what they did was unconstitutional because, you know, the Supreme Court's told us over and over again in the last couple of terms that qualified immunity protects all but the plainly incompetent or those who are willfully violating constitutional rights. Of course, that's what the court's saying. I read your honor's question to be asking me for a case on point. Is that a fair- Also, I'm concerned that what you've just said with Judge Hall is faulting them for failing to come forward with the subjective reason for their action when our analysis is an objective one and limited to what a reasonable officer had to have known. Thank you, your honor. I appreciate you directing me back there. This is exactly, I think, the linchpin and the problem with the city's case, and I cite it in my briefs. If you look at Davenpeck and if you look at Saucer, the information is the knowledge, not their belief about things. I mean, in Davenpeck- I agree we have to take what people knew, but what people knew is different from what conclusions they drew from what they knew. Correct, but here's maybe the disconnect that we're having. Our position is that because they cannot put forward the decision maker, the one that actually did this thing, they are unable then to put forward what that person knew. Because if they had the person that said, I knew these five things, because of these five things I did X, close the pens, we would have one case. That's not the case before your honors. The case before your honors is we did X, they were protesters, and then after the fact, they talk about reasons for why they could have done that. Don't we know a lot about what they knew? They knew that these people had been assigned an area. We know that the police knew that they had not stayed in that area. We know the police knew that they had been put in the pens and that at least some of them were told that it was not clear when they would be allowed to leave. I mean, we can go on and on. We know that their objective was to confront the president. There are many things. We know that the police knew that there were a lot of things going on in the city that night, including some concerns about what was going on 12, 15 blocks out. We know that there had been concerns about behavior of Occupy Wall Street protesters in other recent incidents. I mean, we know a lot about what the police knew. Now it's whether or not they were objectively reasonable in thinking they could hold them in the pen. I understand your honors' point. Obviously, I disagree with it. Why don't we analyze it in terms of what is undisputed or known facts at that time? Well, it's the inference that the person who made the decision knows all of these things. That's where our dispute is. Is that also the law, that police officers working cooperatively, we can assume that they know the facts that are generally available? The fellow officer rule does imply some type of collective knowledge if it's communicated, and we don't have evidence of communication, which is an inference that the defendants are not entitled to in our view. To your honors' point of just the objective reasonableness of the situation, what the defendants are asking for is a special-needs seizure doctrine. There are no cases that talk about a special-needs seizure doctrine. So the idea that they have cover from Second Circuit precedent or Supreme Court precedent for a special-needs seizure or arrest doctrine, I, of course, spent many pages talking about an arrest doctrine, that's not even necessary. This doctrine does not yet exist in our view. There's all of these special-needs search cases. There's drug test cases. There's the whole litany of cases cited by the city's brief. They can't point to a case where there's a special-needs seizure. So the idea that we're then being put forward to say, why can't you find a case that says a special-needs seizure is violative of the Constitution? Well, our answer is, look, it meets all of the elements of a Fourth Amendment false arrest claim. They knew. They were confined. They didn't consent to their confinement. And it's then incumbent upon the defendants to put forward a justification. They are asking your honors to create a special-needs arrest or seizure doctrine. I don't think that's necessary. Would we have to go that far, or would we just be able to say that it's not clearly established in the law that seizing based on special needs is constitutionally impermissible in the circumstances of this case? We wouldn't have to recognize that it is constitutionally impermissible. We would say that it hasn't been clearly established that it's not. I, shockingly, given our position, Arizona v. Grant, there are a few specially delineated exceptions to the warrant requirement. This is a body of law that is carefully policed, and any exception from that body of law, the special-needs search cases also talk about this at length, that this is the parameters of the special-needs exception, and exceptions to the warrant requirement are not done lightly. I mean, this is not something that maybe an officer thought one thing or another thing. This is asking for an expansion of the Fourth Amendment that has never been done before, and the reason that it's clearly established. But why isn't it reasonable? Doesn't your argument have to be it's unreasonable for officers who are protecting the President of the United States not to think that that is the number one priority, essentially enabling them to do something that, I'll grant you that it was a seizure, but that is a de minimis seizure. I mean, people got there, and then they couldn't leave for protecting the President reasons. Well, that's a different question as to whether or not the seizure was de minimis or reasonable. I mean, that's a – but assuming – No, I'm not – I'll go with you. All right. It's a seizure, but don't you have to show that the officers – it was unreasonable for them to think that, and there has to be a case out there that says it, and I can't find one. It's unreasonable for them to think that protecting the President isn't the highest priority thing to do that evening. We certainly don't dispute the importance of protecting the President. I mean, that would – I mean, of course. All right, so then you have to juxtapose those, and you have to find something that says, under all the circumstances here, what the officers did, they should have known, was absolutely unconstitutional. I mean, they let sick people out, and they helped them find assistance. They, of course, let sick people out. I think it's important to look at Seventh Avenue. I think this is really one of the things that I – Seventh Avenue, the place. Seventh Avenue, the street that is going – because if you – yeah, if you look – if you watch the video, that street is open, and open in a – there is traffic going back and forth. I acknowledge – There's traffic, and people going back and forth don't pose the same kind of risk as a clump of 50 to 200 people sitting there who want to confront the President. Other people are moving. They're going. They're leaving. The language of – I mean, confronting with a message. I mean, there's been no – there were no allegations of physical violence or anything like that. No, I didn't mean to – Okay, I just – I'm just – I'm drawing – I think it's not a persuasive contrast that you're drawing because people driving through the area and not stopping, I suppose that someone – I think they do have protocols at some point for eliminating traffic, but they pose different kinds of risk, possibly. That's certainly the defendant's position. If you were going to do something untoward towards the President, being in a group of highly policed Occupy Wall Street protesters, probably not the best way to do that. Not to say that – I mean, if they were actually somebody that had ill intent in mind, and they knew the President was at the Sheraton Hotel, driving down 7th Avenue would seem to me to be something that would pose much more of a risk. But you have to show that it was unreasonable. No, I – I certainly acknowledge that. We've kept you welcome. Thank you very – And I also want to thank you particularly for making sure you understood our questions and tried to respond to them, so thank you very much. Ms. Park, you have just a few minutes to respond. Thank you, Your Honors. Thank you. Thank you, Your Honors. I just want to touch on a few brief points. First, on the absence of a case of applying the special needs doctrine to seizure cases, first, I just want to note that the checkpoint cases are cases involving seizures where the special needs doctrine had been applied. Second, there's no dispute that the protection of the President is a special need. And when you consider that, the question then becomes, what are the reasonable steps that the police can take in order to – There's no person – there's no testimony from an expert individual, from a long-time police officer explaining why each of these steps would have been taken in the record. I mean, I feel like we're left to infer a lot. It may be reasonable to do that, but can you comment on the absence of that kind of explanation in the record? Well, part of it is because – and this maybe underscores our point why these types of cases really shouldn't be litigated. It's the sensitive nature of what we're talking about here. This is closely held information. The plans, the steps, the people who are involved in securing the protection of the President. And because of that, that is part of the challenge in defending these cases. Because, obviously, there is a concern that exposing these sensitive matters would chill law enforcement actions that may be necessary to take the President. I'm not sure either – I'm not sure your adversary was suggesting that you were obliged to disclose your plans. You haven't asked the President to just explain why these protesters couldn't be allowed to leave. And what would have been a reasonable basis for thinking that they couldn't have left, that police could have said, sure, but you're heading west, you're not heading – whatever would have been your reason for not allowing them. Well, again, that's not something that's necessary for us to defend our claims. On the Fourth Amendment claim and the qualified immunity claim, we agree with the court or we agree that purely objective considerations are at issue there. When I was responding to Judge Carney's question, it was just – it was in response to the idea that there is no identified decision-maker in this case. And that could have easily – I didn't mean an identified decision-maker, but even just a veteran of the force explains the considerations and, in particular, the point that Judge Ratchey – and that is our focus here, why individuals couldn't have been allowed to leave and directed west. Your Honor, we don't have that evidence in the record. But because for qualified immunity purposes and Fourth Amendment purposes, the only question is whether a reasonable officer would have been able to infer these conclusions from the facts apparent to them, which are not disputed, that the absence of that kind of evidence is not enough to preclude summary judgment in this case. And just quickly, my adversary had mentioned that this perhaps was not the best way to handle these concerns that were at issue. But, again, we're not here to discuss in hindsight what the best practices might have been. But whether what the police officers did here was within the range of acceptable or reasonable measures, especially considering the fact that they were making an on-the-spot decision where circumstances were unexpectedly unfolding in real time, whether that is still within the breathing room that is afforded to officers in these positions under the qualified immunity doctrine. Your Honor, we had spent most of our time discussing the Fourth Amendment doctrine. Just very briefly, we've explained in our brief why objective considerations will require dismissal of the selective enforcement claim and also the fact that the two recent Supreme Court decisions in Reichel v. Howard's and Wood v. Moss confirmed that allegations of improper motivation won't bar an entitlement to qualified immunity, especially in the context of presidential or vice presidential security. Thank you, Your Honor. Thank you to both sides. Thank you very much. We're going to take the matter under advisement.